IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAIN SHOVLIN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PAUL CARELESS, et al.,<br><br>　　　　　Defendants. | Case No.: C-12-01120 JCS<br><br>**REPORT AND RECOMMENDATION RE ORDER TO SHOW CAUSE**<br><br>**[Dkt. No. 61]** |

## I.   INTRODUCTION

Plaintiff Iain Shovlin ("Plaintiff") brought this action against Defendants Paul Careless ("Careless"), Nigel Warr ("Warr"), MoneyExpert Limited, MoneyExpert Holding Limited, MoneyExpert Insurance Services Limited, MoneyExpert Finance Holdings Limited, Finance Finder UK Limited, and Giant Investment Services Limited (collectively, "Defendants") alleging numerous causes of action.[1] On May 2, 2013, the Court issued an Order to Show Cause why the case should not be dismissed for lack of federal subject matter jurisdiction. At the time, Plaintiff's Motion for Default Judgment was pending. After issuance of the Order to Show Cause, Warr, MoneyExpert Limited, MoneyExpert Holding Limited, and MoneyExpert Insurance Services Limited Moved to Set Aside the Default and argued that the action should be dismissed for lack of subject matter jurisdiction. The Court finds that the OSC is suitable for decision without oral argument. Accordingly, the consolidated hearing on the Order to Show Cause and the pending motions and the case management conference scheduled for June 14, 2013 at 9:30 a.m are vacated. For the reasons set out below, the

---

[1] MoneyWeb Internet Services Limited was also named in Plaintiff's First Amended Verified Complaint. Thereafter, Plaintiff voluntarily dismissed MoneyWeb Internet Services Limited from this action. *See* Dkt. No. 35.

1  Court RECOMMENDS that the case be dismissed without prejudice for lack of subject matter
2  jurisdiction and the pending motions be denied as moot.[2]

## II.   BACKGROUND

Plaintiff alleges as follows.  Technology Crossover Ventures ("TCV") is a private equity and venture capital firm based in California that focuses on growth technology companies.  First Amended Verified Complaint ("FAC"), ¶ 13.  TCMI, Inc. ("TCMI") served as TCV's management company at all relevant times.  *Id*. at ¶ 18.  The FAC refers to both TCV and TCMI as "TCV."  *Id*.  Between June 2003 and February 2009, Plaintiff was employed by TCV.  *Id*. at ¶ 21.  He reported to its Palo Alto, California headquarters.  *Id*.  Plaintiff's job responsibilities included originating investments, conducting diligence on potential investments, and working on and with Boards of Directors for TCV portfolio companies.  *Id*. at ¶ 23.

In or about October 2007, TCV asked Plaintiff to assist in the evaluation and due diligence investigation of MoneyExpert.[3]  *Id*. at ¶ 24.  TCV was contemplating investing $50 million in MoneyExpert at that time.  *Id*.  Plaintiff and his team reviewed financial information that MoneyExpert provided and warranted to be true and accurate.  *Id*. at ¶¶ 25-27.  The documents showed that MoneyExpert's revenues were experiencing a sustained upward trend.  *Id*. at ¶ 26.  Plaintiff also reviewed MoneyExpert's lead generation market, management, and relationships.  *Id*. at ¶ 27.  On the basis of the information provided, Plaintiff recommended that TCV invest in MoneyExpert, putting his professional reputation at stake.  *Id*. at ¶ 28-29.  Moreover, Plaintiff's compensation, in terms of salary and future board of directors appointments to other TCV portfolio companies, was linked to the success of any potential investment in MoneyExpert.  *Id*. at ¶ 29.  After Plaintiff's recommendation, TCV engaged in internal deliberations and meetings to determine whether to invest in MoneyExpert.  *Id*. at ¶ 30.  Warr, an owner, officer, and director of MoneyExpert, flew to California twice in early 2008 to make presentations to TCV soliciting the investment.  *Id*. at ¶¶ 11, 31.  Ultimately, in March 2008, TCV invested $50 million in MoneyExpert, securing a 41% percent ownership stake in the company.  *Id*. at ¶ 32.  Plaintiff was appointed to the MoneyExpert

---

[2] The Court issues this Report and Recommendation because not all parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 1636(c).
[3] In the FAC, Plaintiff refers to each MoneyExpert entity collectively as "MoneyExpert" without distinction.

2

Board of Directors, for which TCV, and therefore Plaintiff, was compensated. *Id*. at ¶¶ 33-34. In his joint capacities, Plaintiff was under a duty to protect the best interests of both MoneyExpert and TCV. *Id*. at ¶ 35.

In April 2008, MoneyExpert held a meeting of its board of directors. *Id*. at ¶ 36. Plaintiff was provided and reviewed financial documents to prepare for the meeting. *Id*. at ¶ 37. Some of the documents were inconsistent with those he relied on in recommending that TCV invest in MoneyExpert. *Id*. Upon investigation, Plaintiff discovered that MoneyExpert's Chief Financial Officer had been denied access to financial records concerning companies named Finance Finder, Money Web, and SCB Media; companies that provided targeted sales leads in the lead generation market and would thus normally be competitors with, rather than customers of, MoneyExpert. *Id*. at ¶¶ 38-42. All three of those companies were owned in whole or in substantial part by Careless. who also owned a minority stake in MoneyExpert, and shared offices with Warr and MoneyExpert. *Id*. at ¶¶ 43-44. Finance Finder and Money Web were omitted from the list of customers provided to TCV. *Id*. at ¶ 45. In addition, Plaintiff discovered a $2 million discrepancy between the revenue MoneyExpert reported to TCV and that provided to Plaintiff in his capacity as a MoneyExpert board member over a four-month period. *Id*. at ¶ 46.

Plaintiff reported his findings to his superior at TCV, who was also a member of the MoneyExpert board, and was instructed to continue his investigation. *Id*. at ¶¶ 47-48. In May 2008, Plaintiff continued his investigation by obtaining a team of auditors from Ernst & Young to enter the MoneyExpert headquarters and examine its financial information to determine its financial condition and activities. *Id*. at ¶ 50. Plaintiff undertook this activity as a Director of MoneyExpert and on behalf of TCV to address the inconsistent and possibly fraudulent reporting made to TCV. *Id*. at ¶ 51.

At some point thereafter, Warr learned of Plaintiff's confiscation of certain MoneyExpert financial data and complained to TCV. *Id*. at ¶ 52. Further, Warr threatened suit if the information was not returned immediately and the audit was not terminated. *Id*. On information and belief, Plaintiff alleges that Warr made misleading statements about MoneyExpert's financial condition and about Plaintiff and Plaintiff's investigation, although Plaintiff is not aware of any specifics. *Id*. at ¶ 53. TCV ordered Ernst & Young to return the seized information and discontinue the audit. *Id*. at ¶

54. Plaintiff never completed the investigation, but uncovered enough information to determine that it was highly likely that Defendants perpetrated fraud on TCV. *Id*. at ¶ 55.

In the summer of 2008, Warr initiated settlement discussions with TCV in an attempt to avoid Plaintiff's attempts to continue investigating MoneyExpert on behalf of TCV. *Id*. at ¶ 56. Warr offered a settlement that included a refund of nearly all of the money paid by TCV to MoneyExpert. *Id*. Plaintiff was instructed to analyze the various settlement options for TCV. *Id*. In December 2008 and January 2009, while conducting an analysis of settlement options, Plaintiff continued his fraud investigation by speaking at length with Careless. *Id*. at ¶ 57. To further his efforts to obtain information from Careless, Plaintiff told Careless that he might at some time in the future consider pursuing new business ventures with Careless if Careless helped uncover Warr's fraudulent acts. *Id*. at ¶ 76. Careless told Plaintiff that Warr intentionally provided inflated revenue figures for MoneyExpert to secure TCV's investment and conspired with Careless to use Careless' companies – Finance Finder and Money Web – to buy leads from MoneyExpert without any business reason to do so, using money provided by Warr in the transactions. *Id*. at ¶¶ 57-58. Plaintiff also learned that Warr paid another of Careless' companies – Giant – to provide a search engine optimization tool to MoneyExpert customers, enabling MoneyExpert to charge increased prices to its customers without paying Giant for the service. *Id*. at ¶ 59. Plaintiff reported his findings to TCV in February 2009, and advised them to refuse all settlement options and seek return of the full $50 million payment. *Id*. at ¶ 60. During December 2008 through February 24, 2009, Plaintiff was acting as a TCV employee and a MoneyExpert Board Member. *Id*. at ¶ 73.

At some point, Warr made the false accusation to one or more members of TCV's management that Plaintiff acted inappropriately in his conversations with Careless and his investigation of MoneyExpert in breach of his fiduciary duties. *Id*. at ¶ 64. On that basis, Warr threatened litigation against TCV. *Id*. Careless also made the allegation that Plaintiff had acted inappropriately in his conversations with Careless in breach of his fiduciary duties. *Id*. at ¶ 65. Plaintiff later learned, in February 2010, that Careless had accused Plaintiff of attempting to convince Careless to stop working with MoneyExpert and begin a new business venture with Plaintiff. *Id*. at ¶ 69. Plaintiff was never informed about any other specifics regarding the false accusations made

against him by Careless. *Id*. at ¶ 65. Careless sent TCV a letter, with the help of Warr, in which he falsely accused Plaintiff of breaching his fiduciary duties to MoneyExpert. *Id*. at ¶ 66. Plaintiff has never seen a copy of the letter. *Id*. Plaintiff first became aware of the letter in March, 2010. *Id*. at ¶ 72.

On an unspecified date, Plaintiff was simultaneously removed from the MoneyExpert board and terminated by TCV. *Id*. at ¶ 77. After his termination, in March 2009, Plaintiff was offered one or more board seats with one or more other companies. *Id*. at ¶ 81. Plaintiff believes that TCV partners disclosed the defamatory statements made by Warr and Careless, and the letter executed by Careless, effectively blocking Plaintiff from being appointed to those board seats. *Id*. at ¶ 82.

On the basis of this factual background, Plaintiff pleads nine causes of action, as follows:

(1)   Defamation – Libel (Against Careless, Finance Finder, and Giant): Plaintiff restates that Warr and Careless verbally provided untrue information to TCV management regarding Plaintiff's alleged malfeasance and Warr threatened to sue based on those accounts. *Id*. at ¶ 85. Plaintiff alleges that he did not fully know of the existence of such statements until March 2012, and still does not know the full content of the statements. *Id*. Plaintiff also restates that Careless drafted and executed a letter, likely with Warr's assistance or guidance, containing additional false allegations about Plaintiff. *Id*. at ¶ 86. Plaintiff alleges that Careless and/or Warr caused the letter to be delivered to TCV executives. *Id*. at ¶ 87. Plaintiff alleges that the letter was an unprivileged communication containing false information about Plaintiff. *Id*. at ¶ 88. Plaintiff alleges that the information caused him to be shunned and avoided and contributed to his termination and his removal from MoneyExpert's board. *Id*. at ¶¶ 89-91.

(2)   Defamation – Slander Per Se (Against All Defendants): Plaintiff restates that Warr and Careless, in their individual capacities and as executives of the named corporate Defendants, verbally provided untrue information to TCV regarding Plaintiff's alleged malfeasance. *Id*. at ¶ 96. Plaintiff alleges that he did not fully know of the existence of such statements until March 2012, and still does not know the full content of the statements. *Id*. at ¶ 97. Plaintiff alleges that Warr and Careless stated to TCV executives that Plaintiff breached his fiduciary duties knowing he did not. *Id*. at ¶¶ 98-99.

1 Plaintiff alleges that these knowingly false statements injured his personal reputation and caused him
2 harm. *Id*. at ¶¶ 100-05.

3    (3) <u>Tortious Interference with Prospective Economic Advantage (Against All Defendants)</u>:
4 Plaintiff alleges that during his employment with TCV he had an economic relationship with it and
5 several other companies. *Id*. at ¶ 107.  In addition, Plaintiff alleges that following his termination by
6 TCV, in early 2009, he reasonably expected to be appointed to one or more boards of directors. *Id*. at
7 ¶ 108.  Plaintiff alleges that, through the above described conduct, Careless and Warr knowingly and
8 intentionally interfered with his economic relationships during 2008 and continuing through February
9 2009. *Id*. at ¶¶ 109-11.

10    (4) <u>Tortious Interference with Contract (Against All Defendants)</u>:  Plaintiff alleges that he
11 had an employment contract with TCV and a contractual relationship with MoneyExpert as a member
12 of its Board. *Id*. at ¶¶ 113-14.  Plaintiff alleges that, with knowledge of those contracts, Defendants
13 knowingly and intentionally interfered with his contracts through the above described conduct. *Id*. at
14 ¶¶ 115-17.  Plaintiff alleges that Defendants committed those intentional acts to interfere with
15 Plaintiff's contracts, and but for Defendants actions those contracts would not have been terminated.
16 *Id*. at ¶¶ 118-19.  Both contracts were terminated in February 2009. *Id*. at ¶¶ 120-21.

17    (5) <u>Breach of Fiduciary Duty (Against All Defendants)</u>:  Plaintiff alleges that, as a member
18 of the MoneyExpert Board, he was in a position to directly benefit from the success of MoneyExpert.
19 *Id*. at ¶ 125.  Plaintiff alleges that the actions of Warr, Careless, and other company executives caused
20 the MoneyExpert investment to be a failure for TCV. *Id*. at ¶ 126.  Plaintiff alleges that Warr,
21 Careless, and other MoneyExpert executives owed him a fiduciary duty in his capacity as a member
22 of the MoneyExpert Board. *Id*. at ¶ 127.  Plaintiff alleges that the above described scheme to inflate
23 MoneyExpert's financials and defraud TCV constituted a breach of fiduciary duty. *Id*. at ¶¶ 128-32.
24 Plaintiff alleges that Warr and Careless' scheme to disseminate false information about Plaintiff to get
25 him terminated and removed was also a breach of their fiduciary duties. *Id*. at ¶ 134.  As a result of
26 the scheme, Plaintiff lost his job and his seat on the Board. *Id*. at ¶ 133.

27    (6) <u>Negligent Misrepresentation (Against All Defendants)</u>:  Plaintiff pleads this claim in
28 the alternative. *Id*. at ¶ 137.  Plaintiff alleges that Warr and Careless made the above described false

statements, and should have known that they were false. *Id*. at ¶¶ 138-41. As a result, Plaintiff was terminated by TCV and removed from the MoneyExpert Board by TCV. *Id*. at ¶ 142.

(7)   Intentional Infliction of Emotional Distress (Against All Defendants): Plaintiff alleges that Warr and Careless acted to stifle his investigation into their wrongful conduct by making knowingly false accusations regarding his asserted breach of his fiduciary duties. *Id*. at ¶¶ 146-50. Plaintiff asserts that the accusations put his truthfulness, honor, professionalism, and professional aptitude into question thereby causing him to lose his job at TCV, his place on MoneyExpert's board, and his ability to obtain other board seats. *Id*. at ¶ 151. As a result, he suffered severe emotional distress. *Id*. Plaintiff alleges that Defendants intended Plaintiff to suffer the harsh consequences of their false accusations and knew, or recklessly disregarded the possibility, that Plaintiff would suffer severe emotional distress as a result of their actions. *Id*. at ¶¶ 152-53.

(8)   Fraud (Against All Defendants): Plaintiff re-alleges that Warr, Careless, and other MoneyExpert executives engaged in a scheme to defraud TCV by inflating MoneyExpert's financials. *Id*. at ¶ 156. The scheme was carried out with the intent to induce Plaintiff to recommend to TCV that it invest in MoneyExpert. *Id*. at ¶ 158. Plaintiff did make that recommendation, relying on fraudulent revenue figures. *Id*. at ¶ 159. Plaintiff thereafter uncovered the fraud and sought to investigate. *Id*. at ¶ 161. To undermine his investigation, Defendants made misrepresentations about Plaintiff. *Id*. at ¶ 162. Defendants intended TCV to rely on their knowingly false statements when making decisions regarding Plaintiff's employment, and TCV justifiably did so by terminating Plaintiff, removing him from the MoneyExpert Board, and blocking his appointment to two other boards of directors. *Id*. at ¶¶ 164-67.

(9)   Fraudulent Concealment: Plaintiff alleges that Defendants breached their duty to truthfully disclose all of MoneyExpert's customers to TCV and Plaintiff by concealing their actions and their accurate revenue figures by excluding Finance Finder and Money Web from the customer list they provided during the due diligence period. *Id*. at ¶¶ 170-72. Plaintiff alleges that this was done to induce him to recommend that TCV invest in MoneyExpert. *Id*. at ¶ 173. As a result of the figures provided, Plaintiff did so. *Id*. at ¶ 174. Had MoneyExpert provided the true figures, Plaintiff would have recommended a smaller investment, or no investment at all. *Id*. at ¶¶ 175-76. Moreover,

7

Plaintiff alleges that Warr and Careless conspired to contact TCV alleging that Plaintiff breached his fiduciary duties to MoneyExpert and drafting a letter to that effect. *Id*. at ¶¶ 177-80.  Plaintiff repeatedly requested a copy of that letter, which he alleges that Defendants had a fiduciary obligation to produce to him while he served on MoneyExpert's board, but he has never learned the complete contents of the letter. *Id*. at ¶¶ 181-84.  As a result, he has never been able to defend himself against its false contents. *Id*. at ¶ 185.

(10)    Civil Conspiracy:  To support this cause of action, Plaintiff re-alleges the above-described conduct and the harm he suffered as a result. *Id*. at ¶¶ 186-96.

## III.    ANALYSIS

### A.    Subject Matter Jurisdiction

#### 1.    Background Law

##### a.    Article III

Federal courts are courts of limited jurisdiction.  "The judicial Power shall extend to all Cases, in Law and Equity, arising under the Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority;--to all cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States; and between a State, or Citizens thereof, and foreign States, Citizens or Subjects."  U.S. Const. art. III, § 2, cl. 1.  "In all Cases affecting Ambassadors, other Public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction.  In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."  U.S. Const. art. III, § 2, cl. 2.

##### b.    Federal Question Jurisdiction

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Federal question jurisdiction

is found only where a federal question appears on the face of a properly pleaded complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

### c. Diversity Jurisdiction

The diversity statute reads as follows:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
> (1) citizens of different States;
> (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
> (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332. By its terms, the diversity statute does not confer jurisdiction in an action solely between citizens of foreign states. The Supreme Court has long held that "the courts of the United States have no jurisdiction of cases between aliens." *Montalet v. Murray*, 8 U.S. (4 Cranch) 46, 47, 2 L.Ed. 545 (1807); *see also Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 824 n.2, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969) (stating that a district court would have no jurisdiction over a suit between foreign entities); *Faysound Ltd. v. United Coconut Chemicals, Inc.*, 878 F.2d 290, 294 (9th Cir. 1989) ("Diversity jurisdiction does not encompass foreign plaintiffs suing foreign defendants").

A prior version of the diversity statute included the following language: "For the purposes of this section … an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." *Van Der Steen v. Sygen Intern., PLC*, 464 F.Supp.2d 931, 933 (N.D. Cal. 2006). In *Van Der Steen*, the plaintiff was citizen of the Netherlands and a legal permanent resident of the United States domiciled in California. *Id.* at 932. The defendants were both citizens of the United Kingdom, as both were corporations incorporated in the United Kingdom with a principal place of business in the United Kingdom. *Id.* at 932-33. Therefore, the issue before the court was whether the court had jurisdiction, pursuant to the statute, to hear claims brought by an alien permanent resident against two foreign corporations. *Id.* at 933.

The *Van Der Steen* court stated that the statute was in apparent conflict with the constitutional limits on alienage jurisdiction. *Id*. at 934. The court further noted that other courts addressing the issue concluded, with near uniformity, that a literal application of the statutory language would be unconstitutional in cases such as the one then before the court. *Id*. at 934-35 (compiling cases). After a thorough review of the case law and the statute's legislative history, the court invoked the constitutional avoidance canon in holding: "Because a plain reading of [that version of] § 1332(a) would unconstitutionally extend federal jurisdiction to allow a suit solely between aliens, and because such an interpretation would be contrary to the legislative intent behind the 1988 Amendment, this Court declines to construe the statute as conferring federal jurisdiction in cases involving only aliens on both sides." *Id*. at 936.

In its analysis, the *Van Der Steen* court noted that prior opinions concluded that the only indication of Congressional purpose in the legislative history was to eliminate "suits between neighbors" wherein a lawsuit between a citizen and a permanent resident of the same state would satisfy the requirements of the diversity jurisdiction statute. *Van Der Steen*, 464 F.Supp.2d at 935. In 2011, after *Van Der Steen* was decided, the diversity statute was again amended. The current version of the statute fulfills the purpose identified in *Van Der Steen* by removing the broad language analyzed in that case and inserting the language in 28 U.S.C. § 1332(a)(2), quoted above, stating that diversity jurisdiction between citizens of a state and citizens or subjects of a foreign state does not exist where the citizen or subject of a foreign state is lawfully admitted for permanent residence and domiciled in the same state as the United States citizen. *See H.K. Huilin Intern. Trade Co., Ltd. v. Kevin Multiline Polymer Inc.*, __ F.Supp.2d __, 2012 WL 5386103, at *1-*5 (E.D.N.Y. Nov. 1, 2012) (thoroughly analyzing the history of the 1988 and 2011 Amendments and concluding that neither version was intended to extend diversity jurisdiction to suits between a resident alien and a non-resident alien). The clear impact of the 2011 Amendment is that there is no basis under the diversity statute to conclude that Congress has conferred federal diversity jurisdiction in cases involving only aliens on both sides.

//
//

### 2. Application to Facts

The Court does not have subject matter jurisdiction over this action. First, there is no federal question on the face of the FAC. The FAC alleges ten causes of action – libel, slander per se, tortious interference with prospective economic advantage, tortious interference with contract, breach of fiduciary duty, negligent misrepresentation, intentional infliction of emotional distress, fraud, fraudulent concealment, and civil conspiracy – raising only issues of California state law and implicating no federal issues.

Second, this action does not fall within the Court's diversity jurisdiction. "Plaintiff is a citizen of the United Kingdom who currently resides in Chicago." FAC, ¶ 5. Defendants are all citizens of the United Kingdom. FAC, ¶¶ 6-11. § 1332(a) does not confer jurisdiction over suits, such as this one, solely between aliens. There is no diversity jurisdiction in this case.

Accordingly, the Court does not have federal subject matter jurisdiction over this case. Responding to the Order to Show Cause, Plaintiff makes two arguments attempting to escape this result. First, Plaintiff argues that a party's citizenship is shown by its domicile regardless of its national citizenship. Plaintiff's Corrected Response to Order to Show Cause, 3-4 (citing *Bank of India v. Subramanian*, 2007 WL 1424668, at *3 (S.D.N.Y. May 15, 2007) (relying on the since removed language in 28 U.S.C. § 1332(a) for the proposition that "an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled"); *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998) (remanding an action to the district court for factual development regarding party's domicile to address whether that party was properly considered a citizen of Florida or Connecticut for the purposes of diversity jurisdiction)). The cases on which Plaintiff relies are inapposite, and this argument must be rejected because there is no diversity jurisdiction over suits solely between aliens. Second, Plaintiff argues that the Court should nevertheless exercise diversity jurisdiction over this action because it would be fair and equitable to do so. *Id*. Whether or not it would be equitable to treat Plaintiff as a citizen of California or provide a federal forum for this dispute, this Court is not free to disregard the limitations on its jurisdiction. A district court is empowered to hear only those cases that are within the judicial power conferred by the United States Constitution and within the area of jurisdiction granted by Congress.

*United States v. Jacobo Castillo*, 496 F.3d 947, 951 (9th Cir. 2007) (en banc).  This argument must also be rejected.

### B.  Leave to Amend

In the alternative, Plaintiff requests leave to file a Second Amended Complaint ("SAC") alleging a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") to create jurisdiction where none exists.  Plaintiff's Corrected Response to Order to Show Cause, 5-6.  The Ninth Circuit has ruled that "a district court is powerless to grant leave to amend when it lacks jurisdiction over the original complaint." *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 n.2 (9th Cir. 1988); *see also Coalition for a Sustainable Delta v. F.E.M.A.*, 711 F.Supp.2d 1152, 1173 (E.D. Cal. 2010) ("where jurisdiction is lacking, 'the district court … [h]as no power to grant … leave to amend…'") (citation omitted).  In *Morongo*, the Ninth Circuit held:  "Subject matter jurisdiction must exist as of the time the action is commenced.  If jurisdiction is lacking at the outset, the district court has no power to do anything with the case except dismiss…  If jurisdiction was lacking, then the court's various orders, including that granting leave to amend the complaint, were nullities." *Morongo*, 858 F.2d at 1380-81 (citations and quotations omitted).

As discussed above, subject matter jurisdiction is lacking under the FAC.  The original Complaint in this action suffers from the same deficiencies.  *See* Dkt. No. 1.  Following *Morongo*, "the[ C]ourt has no power to do anything with the case except dismiss." *See id.* at 1381 (citations and quotations omitted).

//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the reasons stated above, the Court RECOMMENDS that the action be dismissed for lack of subject matter jurisdiction and the pending motions be denied as moot. The dismissal should be without prejudice to bringing the claims in a proper forum. This case shall be reassigned to a District Judge for action on this recommendation.

IT IS SO ORDERED.

Dated: June 6, 2013

_____

JOSEPH C. SPERO
United States Magistrate Judge